UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PATRICK NZUGANG,
*Plaintiff*,

v.

HUTCHINSON PRECISION SEALING SYSTEMS, INC.,
*Defendant*.

No. 3:21-cv-01567 (VAB)

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

Patrick Nzugang ("Plaintiff") filed this lawsuit against Hutchinson Precision Sealing Systems, Inc. ("Hutchinson" or "Defendant"), alleging a violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. Compl. ¶¶ 27–33, ECF No. 1 ("Compl.").

On December 1, 2022, Hutchinson moved for summary judgment on all claims. Mot. for Summ. J., ECF No. 35; Mem. in Supp. of Mot. for Summ. J., ECF No. 36 ("Mot.").

For the following reasons, Hutchinson's motion for summary judgment is **GRANTED in part** and **DENIED in part.**

Hutchinson's motion for summary judgment is granted as to the interference claim and denied as to the retaliation claim.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

In June 2018, Mr. Nzugang began working at Hutchinson as an Application Engineer in Danielson, Connecticut. Pl.'s Local Rule 56(a)(2) Statement ¶¶ 1–4, ECF No. 41-2 ("Pl.'s SOMF"); Local Rule 56(a)(1) Statement of Undisputed Material Facts ¶¶ 1–4, ECF No. 37 ("Def.'s SOMF"). Alex Abreu ("Mr. Abreu") initially supervised Mr. Nzugang. Pl.'s SOMF ¶ 7.

On May 15, 2019, Mr. Abreu gave Mr. Nzugang feedback based on his performance in 2018, Def.'s SOMF ¶ 10; Pl.'s SOMF ¶ 10, using a scale from zero to four, where zero was the lowest score, one was defined as "base," two was defined as "practical," and four was the highest score. Def.'s SOMF ¶ 11; Pl.'s SOMF ¶ 11.

On "technical competencies," Mr. Nzugang scored "practical" in three subcategories and "base" in one subcategory. Def.'s SOMF ¶ 11; Pl.'s SOMF ¶ 11. In the comment section, Mr. Abreu wrote that Mr. Nzugang had "good knowledge in all areas, but still a significant lack with Hutchinson." Def.'s SOMF ¶ 12; Pl.'s SOMF ¶ 12.

On "behavioral competencies," Mr. Nzugang scored satisfactory or better scores on nine of the eleven subcategories. Pl.'s SOMF ¶ 13. Mr. Nzugang scored the lowest score on the scale for two subcategories: "interpersonal effectiveness" and "big picture perspectives." Def.'s SOMF ¶ 13; Pl.'s SOMF ¶ 13. In the comment section, Mr. Abreu noted that Mr. Nzugang was "very innovating," but "must share the ideas and work with the group to understand the feasibility of projects." Def.'s SOMF ¶ 13; Pl.'s SOMF ¶ 13. Mr. Abreu also stated that Mr. Nzugang "[n]eeds improvements in communication, to work more in/with the group, and [to] keep the report of projects." Def.'s SOMF ¶ 13; Pl.'s SOMF ¶ 13.

Overall, for 2018, Mr. Nzugang "achieved above expectations." Pl.'s SOMF ¶ 13.

On February 14, 2020, Mr. Abreu gave Mr. Nzugang feedback based on his performance during 2019. Def.'s SOMF ¶ 18; Pl.'s SOMF ¶ 18. On "competencies related to the position held," Mr. Nzugang received four "practical" scores and one "base" score. Pl.'s SOMF ¶ 19. Mr. Abreu noted in the comment section that Mr. Nzugang should "[f]ocus on communication with multiple projects ongoing." *Id.*; Def.'s SOMF ¶ 19.

On "behavioral competencies," Mr. Nzugang scored satisfactory or better scores on eight

of the eleven subcategories. Pl.'s SOMF ¶ 20. Mr. Nzugang scored the lowest score on the scale for three subcategories: "open-mindedness and adaptability," "interpersonal effectiveness," and "big picture perspective." *Id.*; Def.'s SOMF ¶ 20. Mr. Abreu stated that Mr. Nzugang should "work and focus on the project needs, utilize simple and quick solutions to speed up the project, [and] use technical knowledge to drive the internal and external customer." Def.'s SOMF ¶ 20; Pl.'s SOMF ¶ 20.

On September 28, 2020, Hutchinson informed Mr. Nzugang that he would be transferred from the Danielson, Connecticut, location to the Auburn Hills, Michigan, facility. Def.'s SOMF ¶ 24; Pl.'s SOMF ¶ 24. As part of the transfer, Mr. Nzugang was required to take on more sales-related responsibilities. Def.'s SOMF ¶ 26; Pl.'s SOMF ¶ 26.

On October 5, 2020, Hutchinson assigned Carlos Rodriguez ("Mr. Rodriguez") to be Mr. Nzugang's new direct supervisor. Def.'s SOMF ¶ 27; Pl.'s SOMF ¶ 27.

In October 2020, Mr. Nzugang told Mr. Rodriguez that he would need to take FMLA leave in the future because his wife needed surgery. Def.'s SOMF ¶¶ 29–30; Pl.'s SOMF ¶¶ 29–30. Mr. Nzugang did not provide a specific date because his wife had not yet scheduled the surgery and hospital availability was limited due to COVID-19. Def.'s SOMF ¶ 31; Pl.'s SOMF ¶ 31.

In response, Mr. Rodriguez asked Mr. Nzugang when he would be resigning. Def.'s SOMF ¶ 33; Pl.'s SOMF ¶ 33.

Mr. Nzugang complained to Hutchinson's human resources manager, Revena Carroll ("Ms. Carroll"), about Mr. Rodriguez's response. Def.'s SOMF ¶ 36; Pl.'s SOMF ¶ 36. Ms. Carroll explained that Mr. Rodriguez was not familiar with the FMLA because he is originally from Spain. Def.'s SOMF ¶ 37; Pl.'s SOMF ¶ 37. Ms. Carroll told Mr. Nzugang that she would

explain the FMLA and its requirements to Mr. Rodriguez. Def.'s SOMF ¶ 38; Pl.'s SOMF ¶ 38.

On October 16, 2020, Mr. Rodriguez sent an e-mail to Mr. Nzugang stating that Mr. Nzugang's transfer to Michigan would be delayed due to issues with Mr. Nzugang's performance. Def.'s SOMF ¶¶ 39–40; Pl.'s SOMF ¶¶ 39–40. More specifically, Mr. Rodriguez delayed the transfer for forty-five days to give Mr. Nzugang "adequate time to address discussed items needed for improvement," which were outlined in the e-mail. Def.'s SOMF ¶ 40; Pl.'s SOMF ¶ 40. Mr. Nzugang disagreed with this feedback, in part, because at this point Mr. Rodriguez had been his supervisor for only ten days. Def.'s SOMF ¶ 41; Pl.'s SOMF ¶ 41.

On November 11, 2020, Mr. Rodriguez sent an e-mail to Mr. Nzugang telling Mr. Nzugang to not "forget to give [his] resignation letter to Revena." Ex. 12 to Opp'n at 1, ECF No. 41-15.

On November 18, 2020, Mr. Rodriguez sent an e-mail to Mr. Nzugang asking him to confirm the date that he would take FMLA leave so that Mr. Rodriguez could coordinate who would cover Mr. Nzugang's work while he was out. Def.'s SOMF ¶ 45; Pl.'s SOMF ¶ 45.

Mr. Nzugang was unable to confirm a specific date because his wife had not scheduled the surgery, but Mr. Nzugang responded that he would turn in the required forms fifteen days before his first day of leave. Def's SOMF ¶ 46; Pl.'s SOMF ¶ 46.

On November 25, 2020, Mr. Rodriguez again asked Mr. Nzugang if he knew when he would be taking FMLA leave. Def.'s SOMF ¶ 49; Pl.'s SOMF ¶ 49. Mr. Nzugang was unable to confirm a date because COVID-19 was making it difficult for his wife to schedule the surgery. Def.'s SOMF ¶ 50; Pl.'s SOMF ¶ 50.

Mr. Rodriguez testified that he initially believed that Mr. Nzugang would be taking FMLA leave beginning on December 18, 2020. Ex. 19 to Mot. at 39:20–40:13, ECF No. 38-19

("Rodriguez Dep.").

In December 2020, Mr. Rodriguez hired a new Application Engineer, Maxime Legrand. Ex. 11 to Opp'n ¶¶ 18, 26, ECF No. 41-14 ("Nzugang Decl.").

In January 2021, Mr. Rodriguez asked Mr. Nzugang to train Paul Barragan ("Mr. Barragan"), who had just been transferred into Mr. Nzugang's division, PMD. *Id.* ¶ 26; *see also* Ex. 1 to Opp'n at 74:10–75:24, ECF No. 41-4 ("Nzugang Dep."). Around the same time, Mr. Nzugang testified that he believed that he was being purposefully excluded from meetings. Nzugang Decl. ¶ 27.

On January 22, 2021, Mr. Rodriguez sent an e-mail to Mr. Nzugang providing negative feedback about Mr. Nzugang's solution for a specific customer. Def.'s SOMF ¶ 51; Pl's SOMF ¶ 51.

On January 26, 2021, Mr. Rodriguez sent an e-mail to Mr. Nzugang stating that he was "not happy with the way [Mr. Nzugang] manage[d] the projects or RFQs." Def.'s SOMF ¶ 55; Pl.'s SOMF ¶ 55. Mr. Rodriguez stated that this was "unacceptable" and that he had not seen any improvement from Mr. Nzugang in "a long time." Def.'s SOMF ¶ 55; Pl.'s SOMF ¶ 55. Mr. Rodriguez provided specific examples of poor performance and stated that Hutchinson "cannot continue losing projects because of bad technical support." Def.'s SOMF ¶¶ 56–57; Pl.'s SOMF ¶¶ 56–57.

On April 4, 2021, Mr. Rodriguez sent an e-mail to Mr. Nzugang addressing the need to "instill confidence" with Tremec, one of Hutchinson's clients. Def.'s SOMF ¶ 63; Pl.'s SOMF ¶ 63.

On April 12, 2021, Mr. Rodriguez sent an e-mail to Mr. Nzugang about "Hutchinson PSS Touch Point Review," a meeting that Mr. Rodriguez believed that Mr. Nzugang should have

attended and a meeting that Mr. Nzugang believed that he was purposefully excluded from. Def.'s SOMF ¶¶ 65–67; Pl.'s SOMF ¶ 65–67.

In mid-April, Mr. Rodriguez, in consultation with human resources, decided to terminate Mr. Nzugang. Def.'s SOMF ¶ 68; Pl.'s SOMF ¶ 68; Resp. to Pl.'s Statement of Add'l Facts ¶ 13, ECF No. 44 ("Def.'s Resp. to Pl.'s SOMF").

On April 20, 2021, Mr. Rodriguez and Sri Ray ("Ms. Ray"), a human resources employee, informed Mr. Nzugang that he was terminated. Def.'s SOMF ¶¶ 73–74; Pl.'s SOMF ¶¶ 73–74.

### B. Procedural History

On November 23, 2021, Mr. Nzugang filed the Complaint. Compl.

On January 31, 2022, Hutchinson filed its Answer to the Complaint and its corporate disclosure statement. Answer, ECF No. 15; Corp. Disclosure Statement, ECF No. 16.

On March 2, 2022, the parties submitted a joint Rule 26(f) report. Rep. of Rule 26(f) Planning Meeting, ECF No. 18. On March 4, 2022, then-District Court Judge Sarah Merriam[1] implemented a scheduling order. Scheduling Order, ECF No. 19.

On April 20, 2022, Hutchinson filed a notice that stated the Initial Discovery Protocol does not apply to this case because it is an FMLA action. Notice, ECF No. 20.

On April 22, 2022, Judge Merriam ordered the parties to comply with the Initial Discovery Protocol because the parties agreed to it in their Rule 26(f) report. Order, ECF No. 21.

On June 2, 2022, Mr. Nzugang filed a joint status report. Joint Status Rep., ECF No. 26.

On June 29, 2022, Judge Merriam held a status conference with the parties. Min. Entry, ECF No. 28.

[1] Judge Merriam subsequently became a Circuit Judge on the United States Court of Appeals for the Second Circuit.

On September 2, 2022, Mr. Nzugang filed a joint status report. Joint Status Rep., ECF No. 30.

On September 6, 2022, Judge Merriam ordered the parties to complete Mr. Nzugang's deposition before the close of discovery and to file a joint notice once they are able to agree on a date. Order, ECF No. 31.

On September 15, 2022, Hutchinson filed a joint status report. Joint Status Rep., ECF No. 32.

On September 21, 2022, Judge Merriam ordered Mr. Nzugang to appear for his deposition at the agreed upon date. Order, ECF No. 33.

On October 5, 2022, the case was transferred to this Court. Order of Transfer, ECF No. 34.

On December 1, 2022, Hutchinson filed a motion for summary judgment and memorandum of law in support. Mot. for Summ. J., ECF No. 35; Mot.

On January 23, 2023, Mr. Nzugang filed an objection to Hutchinson's motion for summary judgment. Pl.'s Obj. to Def.'s Mot. for Summ. J., ECF No. 41; Pl.'s Mem. of Law in Supp. of Obj. to Def.'s Mot. for Summ. J., ECF No. 41-1 ("Opp'n").

On February 6, 2023, Hutchinson filed a reply in support of its motion for summary judgment and a response to Mr. Nzugang's statement of additional facts. Reply Br. in Supp. of Def.'s Mot. for Summ. J., ECF No. 43 ("Reply"); Def.'s Resp. to Pl.'s SOMF.

## II. STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute

of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). “[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.” *Id.* at 247–48 (emphasis in the original).

“[T]he substantive law will identify which facts are material.” *Id.* at 248. “Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.” *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (“[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law.” (citing *Anderson*, 477 U.S. at 248)).

“The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.” *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and “demonstrates the absence of a genuine issue of material fact,” the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or “rely on conclusory allegations or unsubstantiated speculation.” *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment “must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.” *Id.* “If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.”

*Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III. DISCUSSION

"The Family and Medical Leave Act provides broad protections to employees who need to take time away from work to deal with serious health conditions of the employee or [his] family." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 165–66 (2d Cir. 2017) (citation omitted). To enforce these protections, the FMLA "creates a private right of action to seek both equitable relief and money damages against any employer (including a public agency) in any Federal or State court of competent jurisdiction should that employer interfere with, restrain, or deny the exercise of FMLA rights." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (internal quotation marks omitted).

The FMLA authorizes claims for both retaliation and interference. *See Woods*, 864 F.3d

at 166. "Retaliation claims . . . involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer." *Id.* (internal quotation marks omitted). An employee may bring an interference claim when the employer "has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA." *Id.* Thus, these two types of claims "serve as *ex ante* and *ex post*" remedies for employees who seek to assert their rights under the FMLA. *Id.*

Hutchinson argues that Mr. Nzugang's FMLA retaliation and interference claims cannot survive summary judgment. Mot. at 1–2.

The Court will address each claim below.

**A. Retaliation**

FMLA retaliation claims are analyzed under the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). The plaintiff must first make out a *prima facie* case of retaliation. *Id.* at 168. If the plaintiff does so, the defendant must demonstrate "a legitimate, non-discriminatory reason for its actions." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016). If the defendant meets this burden, "the plaintiff must then show that defendant's proffered explanation is pretextual." *Id.*

Hutchinson argues that Mr. Nzugang's retaliation claim cannot survive summary judgment because Mr. Nzugang cannot meet his burden to prove a *prima facie* case of retaliation and, even if he could, Mr. Nzugang has not provided sufficient evidence of pretext. Mot. at 2.

The Court will address each issue in turn.

**1. *Prima Facie* Case**

To make out a *prima facie* case of retaliation at the first step, the plaintiff must show that "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168. The evidence required to demonstrate a *prima facie* case "has been characterized as '*de minimis*.'" *Wanamaker v. Town of Westport Bd. of Educ*., 11 F. Supp. 3d 51, 72 (D. Conn. 2014) (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)).

Hutchinson argues that Mr. Nzugang's "only evidence" of retaliation is that "when [Mr. Nzugang] told [Mr.] Rodriguez of his need for FMLA leave," Mr. "Rodriguez responded by asking [Mr. Nzugang] if he would be submitting a resignation letter." Mot. at 12. In Hutchinson's view, this is insufficient to establish a causal connection between the FMLA request and the termination because six months passed between this interaction and Mr. Nzugang's termination. *Id.* Hutchinson emphasizes that "[c]ourts within this Circuit have held consistently that a significant gap in time between the exercise of a right under the FMLA and a plaintiff's termination severely undermines the fourth *prima facie* element." *Id.* at 13. In Hutchinson's view, the six-month gap between the above conversation and Mr. Nzugang's termination is longer than the three- to four-month gaps that courts routinely find are insufficient. *Id.* at 14.

Hutchinson next argues that Mr. Nzugang cannot overcome the temporal issue with other evidence because Mr. Nzugang's theory for why Mr. Rodriguez retaliated—that Mr. Rodriguez did not have anyone to replace Mr. Nzugang and did not want to reorganize the team—does not make logical sense. *Id.* More specifically, Hutchinson contends that Mr. Rodriguez would

necessarily have had to replace Mr. Nzugang and reorganize the team after terminating him. *Id.* Hutchinson also argues that Mr. Rodriguez was not displaying retaliatory animus when he asked if Mr. Nzugang would resign because Mr. Rodriguez did not understand the FMLA requirements as he had previously worked under European labor laws. *Id.*

Finally, Hutchinson argues that Mr. Nzugang's claim that Mr. Rodriguez's criticisms about his work were due to retaliatory animus cannot provide the needed causal connection because Mr. Nzugang's prior manager, Mr. Abreu, provided performance reviews that were "entirely consistent with [Mr.] Rodriguez's." *Id.* at 15. In Hutchinson's view, Mr. Nzugang's 2018 and 2019 reviews were negative and therefore, Mr. Rodriguez's negative feedback in 2020 and 2021 were not in retaliation to Mr. Nzugang's FMLA request. *Id.*

Mr. Nzugang responds that, to meet the FMLA causation standard, he "does not have to prove that the FMLA was the sole or even the principal reason for the adverse employment decision," only that the FMLA request was a "negative factor in [the] defendant's decision to terminate his employment." Opp'n at 12–13 (citing 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(c); *Woods*, 864 F.3d 158). In Mr. Nzugang's view, Mr. Rodriguez's response to his FMLA request—asking when he would submit his resignation—constitutes direct evidence of retaliatory intent that is sufficient to survive summary judgment, at least as to the *prima facie* case. *Id.* at 13.

Mr. Nzugang also argues that while "closeness in time between the protected activity and the adverse action may be unusually suggestive of retaliatory motive," there "is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between [protected activity] and an allegedly retaliatory action." *Id.* at 14. Mr. Nzugang emphasizes that the causal significance of the temporal relationship is a question

for the trier of fact. *Id.* In Mr. Nzugang's view, the five- to six-month time period "permits an inference of a causal connection." *Id.* at 15 (citing *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–45 (2d Cir. 1980)). Mr. Nzugang also emphasizes that "the timing evidence cannot be viewed in isolation" and should be considered in the context of Mr. "Rodriguez's knowledge of the FMLA request, and his immediate reaction to the request by telling plaintiff to resign." *Id.*

In reply, Hutchinson first argues that Mr. Rodriguez's statement—asking Mr. Nzugang if he will submit a letter of resignation—is not direct evidence of retaliatory intent because it is not specific enough and it was made six months before the termination decision. Reply at 2–3. Hutchinson also emphasizes that Mr. Nzugang does not address Mr. Rodriguez's explanation for his misunderstanding of the FMLA requirements. *Id.* at 3.

Next, Hutchinson argues that Mr. Nzugang does not adequately address the temporal issue identified in its opening brief. *Id.* at 3–4. In Hutchinson's view, *Grant v. Bethlehem Steel*, which Mr. Nzugang relies on in his opposition brief, is distinguishable because in that case there were three plaintiffs, two of whom had a shorter time period between the protected activity and the adverse employment action. *Id.* at 4.

The Court disagrees.

As an initial matter, the Court focuses this discussion on the fourth element, whether "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent," *Potenza*, 365 F.3d at 168, because the parties do not dispute that the first three elements are met.

To establish an inference of retaliatory intent, the plaintiff must meet the "motivating factor" causation standard. *See Woods*, 864 F.3d at 166. In other words, retaliatory intent is established "when there is a basis for a jury to conclude that 'a causal connection [exists]

between the plaintiff's protected activity and the adverse action taken by the employer.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012) (alteration in original) (quoting *Mack v. Otis Elevator Co*., 326 F.3d 116, 129 (2d Cir. 2003)); *see also Hicks*, 593 F.3d at 164.

An inference of retaliation can be established: "(i) indirectly through a showing that the protected activity was followed closely by discriminatory treatment, commonly known as 'temporal proximity;' (ii) indirectly through other evidence such as disparate treatment of similarly-situated employees; or (iii) directly through a showing of evidence of retaliatory animus toward plaintiff by defendant." *Alexander v. Bd. of Educ. of City Sch. Dist. of N.Y.C.*, 107 F. Supp. 3d 323, 328–29 (S.D.N.Y. 2015) (citing *Carr v. WestLB Admin., Inc*., 171 F. Supp. 2d 302, 309 (S.D.N.Y. 2001)), *aff'd sub nom. Alexander v. Bd. of Educ. of N.Y.C.*, 648 F. App'x 118 (2d Cir. 2016).

"A close temporal relationship between the exercise of a protected right and an adverse employment action can, in some cases, sustain the conclusion that the action was a retaliation for the exercise of the right." *Kim v. Goldberg, Weprin, Finkel Goldstein, LLP*, 862 F. Supp. 2d 311, 319 (S.D.N.Y. 2012). Although the Second Circuit has not drawn a bright line to define when a temporal relationship is too attenuated to establish a causal relationship without "other direct or indirect evidence" of causation, courts regularly find that "two to three months between the protected activity and the adverse employment action" is typically the outer limit. *Id.* (internal citations omitted); *see also O'Reilly v. Consol. Edison Co. of N.Y., Inc.*, 173 F. App'x 20, 22 (2d Cir. 2006) ("While close temporal proximity can give rise to an inference of retaliation, the three month gap between [plaintiff]'s FMLA leave and her termination is not sufficient to give rise to an inference of retaliation in light of the additional leave time [the defendant]'s policy allowed."

(citation omitted)); *Clark v. Stop & Shop Supermarket Co*., No. 3:15-CV-304 (JCH), 2016 WL 4408983, at *10 (D. Conn. Aug. 16, 2016) (finding that the plaintiff failed to show an inference of retaliation where he was terminated five months after his return from FMLA leave); *Monclova v. City of New York*, No. 12-CV-3187 (KAM) (RML), 2014 WL 4828813, at *17 (E.D.N.Y. Sept. 29, 2014) (finding that three months is a "generally accepted" time-period "for raising an inference of retaliation based on temporal proximity"); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) (finding that, generally, "[t]hree months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation").

Here, Hutchinson's temporal argument relies on cases in which the plaintiffs' only evidence to establish a causal connection was the temporal proximity of the protected activity and the adverse employment action.[2] This is the generally accepted rule in this Circuit, and

[2] *See Kim*, 862 F. Supp. 2d at 319 ("Therefore, the four month gap between Kim's 2009 Leave and her termination precludes the Court from presuming that there was a causal connection based on temporal proximity alone. Thus, Kim must demonstrate causation through other direct or indirect evidence to prove her prima facie case."); *Kamrowski v. Morrison Mgmt. Specialist*, No. 05-CV-9234 (KMK), 2010 WL 3932354, at *22 (S.D.N.Y. Sept. 29, 2010) ("Furthermore, even assuming that Plaintiff has sufficiently shown that she engaged in protected activity, Plaintiff cannot show causation based solely on temporal proximity when almost four months passed between her reporting of allegedly discriminatory incidents in March 2003 and Mr. Chandler's first warning letter on June 27, 2003."); *Smith v. Da Ros*, 777 F. Supp. 2d 340, 357–58 (D. Conn. 2011) ("However, for the reasons that follow, the Court finds that the timing of Mr. Smith's discharge is not evidence sufficient to support a reasonable jury finding that Mr. Smith's speech or political affiliation was a substantial or motivating factor in the adverse employment action."); *Konspore v. Friends of Animals, Inc.*, No. 3:10-cv-613 (MARK), 2012 WL 965527, at *20 (D. Conn. Mar. 20, 2012) (finding the six and a half month "time lapse weighs heavily against a finding that either incident resulted in her termination" where the other evidence the plaintiff offered also did not support an inference of retaliatory motivation); *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990) ("Nonetheless, Hollander has not offered any evidence which would fulfill the final requirement of a causal nexus between his [July 1984] filing of the agency complaint, on the one hand, and American Cyanamid's October 26[, 1984] letter and Ethicon's refusal to hire him, on the other."); *Sgarlata v. Viacom, Inc.*, No. 02. Civ. 7234 (RCC), No. 03 Civ. 5228 (RCC), 2005 WL 659198, at *6–7 (S.D.N.Y. Mar. 22, 2005) (finding that the plaintiff "has produced no evidence to suggest that he was included in the [reduction in force] because he had taken FMLA leave" and therefore, the plaintiff's "eventual termination as part of the RIF [was] too far removed temporally from his EEOC complaint to establish a causal connection in satisfaction of a prima facie case"); *Ponticelli v. Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 438 (S.D.N.Y. 1998) ("Because Ponticelli has offered no evidence, apart from bare conclusion, linking the complaints she made with her termination—whether through a temporal connection or otherwise—and because she would not be able to establish a genuine issue of material fact as to the reasons for her termination, summary judgment is granted to Defendants on the retaliation claim."); *Yarde*, 360 F. Supp. 2d at 562 (finding insufficient evidence of causation where "there was a three month interval between plaintiff's complaint about Bassi's alleged remark and

where the plaintiff is not relying on "temporal proximity alone," he can "demonstrate causation through other direct or indirect evidence." *Kim*, 862 F. Supp. 2d at 319; *see also Amley v. Sumitomo Mitsui Banking Corp.*, No. 19 Civ. 3777 (CM) (BCM), 2021 WL 4429784, at *14 (S.D.N.Y. Sept. 27, 2021) (finding there was insufficient evidence to support an inference of retaliation because "timing [was] the only basis for [the p]laintiff's claim that he was retaliated against" and there was "no evidence that [the p]laintiff was treated differently than similarly situated individuals with a history of negative performance reviews").

Here, there are genuine disputes of materials facts that preclude summary judgment on the *prima facie* case.

More specifically, the parties dispute factual issues related to Mr. Rodriguez's initial response to Mr. Nzugang's FMLA request in October 2020, Mr. Rodriguez's decision to hire a new Application Engineer and transfer an Application Engineer into Mr. Nzugang's division in December 2020, the feedback given both before and after Mr. Nzugang requested FMLA leave, and Hutchinson's different treatment of Mr. Nzugang and Paul Barragan ("Mr. Barragan") in terms of providing a formal performance improvement plan. *See infra* pp. 24–25; *see also* Def.'s SOMF ¶ 68; Pl.'s SOMF ¶ 68; Def.'s Resp. to Pl.'s SOMF ¶ 13 (stating that Mr. Rodriguez, in consultation with human resources, made the decision to terminate Mr. Nzugang).

These dispute, in combination with the temporal proximity between Mr. Nzugang's FMLA leave request and his termination, when "construe[d] . . . in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor," *Gary Friedrich Enters., LLC*, 716 F.3d at 312 (citation omitted), are sufficient to preclude summary judgment on the *prima facie* case. *See Willford v. United Airlines, Inc.*, No. 18 Civ. 1060 (GBD), 2021 WL

---

her suspension, and six months passed between her complaint and her termination" both because the temporal connection was insufficient and there were "substantial intervening events" leading to the plaintiff's termination).

4066502, at *4 (S.D.N.Y. Sept. 7, 2021) (finding the plaintiff raised an inference of discrimination under Title VII and the FMLA where the plaintiff's supervisor stated that if the plaintiff "wanted to take time off to be a mother, then this wasn't the job for [her] and [she] should quit" because the supervisor was involved in the investigation that led to the decision to terminate her); *Albertin v. Nathan Littauer Hosp. & Nursing Home*, 537 F. Supp. 3d 243, 269–70 (N.D.N.Y. 2021) (finding an inference of discrimination, despite a four-month gap between the FMLA request and the adverse employment decision and despite the plaintiff's preexisting "bad relationship" with her supervisor, because the plaintiff's supervisor "asked whether plaintiff was using her FMLA leave to sabotage her vacation plans" and another supervisor "grew agitated" trying to "handle the resulting backlog of work"); *see also Wanamaker*, 11 F. Supp. 3d at 72 (stating that the evidence required to demonstrate a *prima facie* case "has been characterized as '*de minimis*'" (quoting *Hicks*, 593 F.3d at 166)).

Accordingly, Hutchinson's motion for summary judgment will be denied on these grounds.

**2. Pretext**

Once the defendant demonstrates "a legitimate, non-discriminatory reason for its actions," the plaintiff "must then show that defendant's proffered explanation is pretextual." *Graziadio*, 817 F.3d at 429. A plaintiff demonstrates pretext where he shows that a retaliatory motive played a role in causing the adverse employment action. *Hicks*, 593 F.3d at 164.

Hutchinson argues that, even if Mr. Nzugang can establish a *prima facie* case, no reasonable jury would conclude that Hutchinson's stated reasons for terminating Mr. Nzugang—"his ongoing lack of performance, lack of accountability, and the effects those issues were having on the business"—were pretextual. Mot. at 16–18. In Hutchinson's view, its reasons for

terminating Mr. Nzugang are factually supported and the performance issues began before Mr. Nzugang requested FMLA leave. *Id.* at 16–17.

Hutchinson further argues that even if its stated reasons for terminating Mr. Nzugang are disproved, "no rational fact finder could conclude that the action was retaliatory. *Id.* at 17. More specifically, Hutchinson argues that no reasonable fact finder would believe that Mr. Rodriguez was upset about reorganizing his team for Mr. Nzugang's FMLA leave such that he waited six months and then terminated him. *Id.* Hutchinson also emphasizes that Mr. Nzugang has not pointed to any other employee under Mr. Rodriguez who was fired for taking FMLA leave. *Id.* at 18.

Mr. Nzugang responds that Hutchinson's proffered legitimate reasons for terminating him are pretextual because Hutchinson typically puts struggling employees on a "performance improvement plan" or re-assigns responsibilities, but Hutchinson did not put Mr. Nzugang on such a plan or re-assign any responsibilities despite identifying performance issues for several months. Opp'n at 16. Mr. Nzugang notes that Hutchinson placed Mr. Barragan, another Application Engineer who had never requested FMLA leave, on a performance improvement plan. *Id.* In Mr. Nzugang's view, Hutchinson "opt[ed] to have a disciplinary system that involves warnings" and therefore, Hutchinson's "failure to follow the system permits the inference of pretext." *Id.* (citing *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 351 (5th Cir. 2005)).

Mr. Nzugang also argues that Mr. Rodriguez's testimony about the assignments and projects that demonstrated Mr. Nzugang's deficient performance is not credible. *Id.* at 17–18. More specifically, Mr. Nzugang contends that some of the "failed projects" that Mr. Rodriguez cites "were not plaintiff's responsibility" or failed after Mr. Nzugang was terminated; the co-worker complaints were from employees that left Hutchinson eight months to one year before

Mr. Nzugang was terminated; Mr. Rodriguez included in his feedback customers that Mr. Nzugang did not work for, such as TPA; Hutchinson lost the Hanon project because Hutchinson used a margin that "was not competitive"; Mr. Nzugang was not involved with the Mexico facility and therefore could not be at fault for those issues; and the customer confidence problem noted in Mr. Rodriguez's April 2021 e-mails were caused by another employee's error. *Id.* at 17–18.

Mr. Nzugang emphasizes that Mr. Rodriguez hired his replacement in December 2020 and asked Mr. Nzugang to train him. *Id.* at 18. In Mr. Nzugang's view, this step was taken shortly after he requested FMLA leave and therefore, supports his pretext argument. *Id.*

Finally, Mr. Nzugang notes that he was given a pay raise in Spring 2020 before Mr. Rodriguez became his supervisor, and Hutchinson asked him to relocate to Michigan in September 2020, before Mr. Nzugang requested FMLA leave. *Id.* at 19. In Mr. Nzugang's view, "[p]oor performing employees typically do not receive pay raises" and Hutchinson "would not have requested his relocation if he was a poor performer." *Id.*

In its reply, Hutchinson argues that, despite Mr. Nzugang's argument that Mr. Rodriguez's "numerous written criticisms . . . were factually unsupported and incorrect," Mr. Nzugang's theory of animus "defies all logic." Reply at 6. More specifically, Hutchinson contends that "[i]f [Mr.] Rodriguez's concern was that he did not want to have to find someone to replace Plaintiff, it defies all logic that his response . . . would be to remove Plaintiff from the workforce—an act that thus forced him into the very outcome of finding a replacement." *Id.* Hutchinson emphasizes that Mr. Rodriguez testified that "terminations are always a last resort, as it takes time and financial resources to replace and train a terminated employee." *Id.*

Finally, Hutchinson argues that Mr. Rodriguez "provided [Mr. Nzugang] with a multitude

of emails, setting forth where he found his performance to be lacking and in need of improvement" and therefore, even if Mr. Nzugang was not given any documents titled "performance improvement plan," Mr. Rodriguez made "repeated attempts to encourage Plaintiff to improve his performance." *Id.* at 7.

The Court disagrees.

A plaintiff may prove pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination . . . . [O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.").

Here, the parties dispute several facts material to the pretext inquiry.

First, the parties disagree about the implication of Mr. Rodriguez's response to Mr. Nzugang's initial request for FMLA leave. *See* Reply at 3 (arguing Mr. Rodriguez initially asked if Mr. Nzugang would submit a resignation because Mr. Rodriguez's "understanding is that individuals who go on leave resign and then reapply" based on his experience in European workplaces); Opp'n at 17 (arguing Mr. Rodriguez's immediate reaction is direct evidence of FMLA discrimination).

While Hutchinson contends that it is not logical that Mr. Rodriguez would terminate an employee to avoid that employee going on FMLA leave because both FMLA leave and termination would require that Mr. Rodriguez reorganize his employees, the Court disagrees.

Terminating an employee would allow Mr. Rodriguez to permanently reorganize his team of employees, which, while initially inconvenient, would resolve the issue once the new employee was onboarded and trained. Conversely, Mr. Nzugang's leave would require Mr. Rodriguez to reorganize his team to temporarily cover Mr. Nzugang's work responsibilities while holding his position open for when Mr. Nzugang returned.[3] Therefore, the parties have offered two competing, reasonable interpretations of Mr. Rodriguez's motivation based on his request that Mr. Nzugang resign.

Second, there is evidence, albeit disputed, to suggest that Hutchinson may have taken steps to replace Mr. Nzugang on a permanent basis beginning in December 2020. For example, Mr. Rodriguez testified that he initially believed that Mr. Nzugang would be taking FMLA leave beginning on December 18, 2020. Rodriguez Dep. at 39:20–40:13 (stating that he believed that Mr. Nzugang "was leaving on the 18th of December" for FMLA leave).

Then, Hutchinson, and more specifically Mr. Rodriguez, hired a new Application Engineer, Mr. Legrand, who began working under Mr. Rodriguez in December 2020. Nzugang Decl. ¶¶ 18, 26 (stating that Mr. Rodriguez hired a French employee to be an Application Engineer in December 2020, which requires proving that there is "a vacant position and . . . nobody was found meeting the job requirements," and stating that Mr. Rodriguez issued a new organizational chart in December 2020 that included the "new Application Engineer" and "assign[ed] Paul Barragan as second Application Engineer" in his division). *But see* Rodriguez Dep. at 48:6–7 (stating Mr. Nzugang's replacement was not hired until September 2021).

[3] Likewise, Mr. Nzugang's "admission" that Mr. Rodriguez treated all employees the same when Mr. Nzugang testified that Mr. Rodriguez was a "bully" and fired many people does not necessarily mean that Mr. Rodriguez did not terminate Mr. Nzugang based on his request for FMLA leave. *See* Reply at 3 (arguing that Mr. Rodriguez did not have the requisite motivation because he "bullied and fired many people" and "[t]he conduct of jerks and bullies is not actionable solely because they are rude"). Mr. Nzugang may have believed that Mr. Rodriguez was a bully, and Mr. Rodriguez may have considered Mr. Nzugang's FMLA request a negative factor when he decided to terminate Mr. Nzugang. These contentions are not mutually exclusive.

In January 2021, Mr. Rodriguez asked Mr. Nzugang to train Mr. Barragan, who had just been transferred into Mr. Nzugang's division. *Id.* ¶ 26; *see also* Nzugang Dep. at 74:10–75:24. Around the same time period, Mr. Nzugang testified that he began to be excluded from meetings. *Id.* ¶ 27 (stating he complained about "exclusion from internal meetings by the new Account Manager"). Taken together, and construed in the light most favorable to Mr. Nzugang, this evidence reasonably suggests that Hutchinson may have taken steps to replace Mr. Nzugang on a permanent basis beginning in December 2020, not long after Mr. Rodriguez's initial comment in response to Mr. Nzugang's initial request for FMLA leave.

Third, the parties dispute the meaning of the feedback Mr. Nzugang received before and after he notified Hutchinson about his intent to request FMLA leave in October 2020. More specifically, as it relates to Mr. Abreu's feedback, given before Mr. Nzugang requested FMLA leave, Mr. Rodriguez and Mr. Nzugang testified to different understandings of Mr. Abreu's feedback. Rodriguez Dep. at 15:16–17:19 (stating that he had "10-plus communications with Alex" Abreu about Mr. Nzugang's poor performance between "January of 2020 [and] September 2020"); Nzugang Dep. at 37:23–39:12 (testifying that he understood that Mr. Abreu was "a hard grader" and the feedback "wasn't specific to . . . his job performance").[4] Notably, after receiving feedback from Mr. Abreu but before Mr. Nzugang requested FMLA leave, Mr. Nzugang received a raise. Nzugang Dep. at 38:22–40:5 (stating that he, along with all other employees, received a 2 percent raise); *id.* at 38:20–24 (stating that Mr. Abreu told him he would get a raise

[4] Both Mr. Nzugang and Mr. Rodriguez testified about what Mr. Abreu told them, making the testimony hearsay. There are portions of the testimony, however, that speak to Mr. Rodriguez's and Mr. Nzugang's understanding of Mr. Abreu's feedback that would potentially be admissible as not hearsay for that limited purpose. *See, e.g.*, *Rush Indus., Inc. v. Garnier LLC*, 309 F. App'x 431, 432–33 (2d Cir. 2009) (finding "affidavits [that] describe[d] the out-of-court statements of third parties" admissible "not for their truth, but rather as evidence of the speakers' state of mind"). At trial, however, Mr. Abreu's testimony would be necessary to establish the truth of what he meant when he provided feedback to Mr. Nzugang.

and that that wouldn't change based on the feedback).

Likewise, the parties dispute the factual basis of Mr. Rodriguez's feedback, which was given after Mr. Nzugang requested FMLA leave. More specifically, Mr. Rodriguez cited several specific examples of poor performance that lead to his decision to terminate Mr. Nzugang, including losing work opportunities from clients such as Sensata, Ford,[5] Tremec, Yazaki, Kohler, Hanon, Stant, Leggett and Platt, and TPA, Rodriguez Dep. at 22:19–23, 23:17–19; 30: 1–21.

Mr. Nzugang disputes his personal involvement in Hutchinson losing the above-mentioned customers. First, Mr. Nzugang states that Hutchinson was still doing work for Sensata up until the time he was terminated and, the technical designs for the project were complete when Mr. Nzugang left Hutchinson. Nzugang Decl. ¶ 13. Second, Mr. Nzugang contends that Hutchinson lost work from Ford because Ford did not want to launch a new product while previous parts were in production, which was not related to Mr. Nzugang's performance. *Id.* ¶ 10. Third, Mr. Nzugang testified that Mr. Rodriguez blamed Mr. Nzugang for an error the Design Engineer made on the Tremec project. Nzugang Dep. at 86:20–87:24. Fourth, Mr. Nzugang testified that Hutchinson was still doing work for Kohler when he was terminated and that he did not have any responsibility on the Kohler project. Nzugang Decl. ¶¶ 8–9. Fifth, Mr. Nzugang stated that Hutchinson did not win a bid to work on the Hanon project because it used "60% margin on topics," which was "not competitive." *Id.* ¶¶ 14–15. Sixth, as to Leggett and Platt, Mr. Nzugang stated that he did not have a role on the work because the project "was

[5] Mr. Rodriguez stated that Hutchinson lost the Ford project because Hutchinson "couldn't support [the] customer with reliable technical support and without a reliable technical solution," which he described as "Hutchinson['s]" fault. *See id.* at 24:19–24. Mr. Rodriguez also testified that there were issues with teamwork between sales and application engineers that meant Hutchinson "lost some time in finding the solutions." *Id.* at 25:2–26:4. Mr. Rodriguez stated that he took issue with Mr. Nzugang's performance during the Ford project because he "air[ed] out [a] disagreement in front of the customer." *Id.* at 27:8–14.

assigned to Hutchinson China." *Id.* ¶ 11. Finally, as to TPA, Mr. Nzugang testified that he "never did any work for . . . TPA." *Id.* ¶ 12.[6]

Neither party provided documentation to support their testimony, other than Mr. Rodriguez's own prior statements in e-mails, and therefore, resolving the disputes about feedback requires credibility determinations that the Court cannot make at this stage. *See, e.g.*, *Rogoz v. City of Hartford*, 796 F.3d 236 (2d Cir. 2015) ("In reviewing the evidence and the inferences that may reasonably be drawn, the court may not make credibility determinations or weigh the evidence." (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545–46 (2d Cir. 2010))).

Fourth, the parties dispute whether Mr. Nzugang should have been placed on a formal performance improvement plan before Hutchinson decided to terminate him.[7] More specifically, Mr. Rodriguez gave Mr. Nzugang feedback about the areas of his work that needed improvement several times over the course of six months. *See* Def.'s SOMF ¶¶ 39–40, 51, 55–57; Pl.'s SOMF ¶¶ 39–40, 51, 55–57; *see also* Ex. 10 to Mot, ECF No. 38-10 ("October 16, 2020 E-Mail"); Ex. 13 to Mot., ECF No. 38-13 ("Jan. 22, 2021 E-Mail"); Ex. 14 to Mot., ECF No. ("Jan. 26, 2021 E-Mail"); Ex. 15 to Mot., ECF No. 38-15 ("Apr. 4, 2021 E-Mail"); Ex. 16 to Mot., ECF No. 38-16 ("Apr. 12, 2021 E-Mail"). Mr. Rodriguez, however, did not provide Mr. Nzugang a formal performance improvement plan. *See supra* n.7. Mr. Rodriguez did, however, put Mr. Barragan,

[6] Mr. Nzugang does not appear to address Yazaki or Stant; however, the Court cannot determine based on the record before it whether Mr. Rodriguez would have terminated Mr. Nzugang based only on his performance on projects for these two customers.

[7] Mr. Rodriguez testified that Mr. Nzugang was on a performance improvement plan, Rodriguez Dep. at 19:18–25, but Mr. Nzugang testified that he was not, Nzugang Decl. ¶ 22. Hutchinson appears to concede that Mr. Rodriguez was referring to the informal feedback he gave Mr. Nzugang, rather than a formal performance improvement plan. *See* Def.'s Resp. to Pl.'s SOMF ¶14 ("It is admitted for the purposes of summary judgment that [Mr.] Rodriguez testified that Hutchinson uses performance improvement plans on occasion but it is rare and 'not so common.' . . . The fact that [Mr. Nzugang] did not receive a formal document entitled 'performance improvement plan' is immaterial . . . .").

who has never requested FMLA leave, on a performance improvement plan when Mr. Barragan's work needed improvement. *See* Rodriguez Dep. at 31:12–22.

Mr. Rodriguez testified that Hutchinson does use performance improvement plans but that it is "not so common." Rodriguez Dep. at 19. It was unclear from his testimony, however, whether it was "not so common" because there are not many struggling employees or because Hutchinson only places a subset of the struggling employees on a performance improvement plan. *Id.* (stating that performance improvement plans were not common because "when you are hiring someone, you're hiring someone with skills").

Hutchinson does not dispute that it did not provide Mr. Nzugang with a performance improvement plan, assign additional training, or re-assign his responsibilities, despite the availability of these remedial options. Def.'s Resp. to Pl.'s SOMF ¶¶15–17. Instead, Hutchinson simply contends that doing so was unnecessary because Mr. Nzugang was educated and had twenty years of experience. *Id.* Mr. Nzugang, however, can establish an inference of pretext if there were "procedural irregularities" in the termination decision. *March v. First Choice Med. PLLC*, No. 17-CV-4272 (RRM) (SIL), 2021 WL 3006043, at *13 (E.D.N.Y. July 15, 2021) (citing *Stern v. Trs. of Columbia Univ. in N.Y.C.*, 131 F.3d 305, 313 (2d Cir. 1997)). Therefore, these facts support an inference of pretext.

These disputes, in combination with the timing issue discussed above, preclude summary judgment on pretext. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 129–30 (2d Cir. 2013) (finding plaintiff made a sufficient showing of pretext to survive summary judgment where the record contained evidence supporting plaintiff's narrative and disproving factual elements of the defendant's legitimate rationale for its adverse action); *Treglia v. Town of Manlius*, 313 F.3d 713, 721–22 (2d Cir. 2002) (finding, on retaliation claims under the ADA and Rehabilitation

Act, that the plaintiff made a sufficient showing on pretext to survive summary judgment where there were statements made by managers that indicated a retaliatory motive and the record contained evidence that could refute the defendant's legitimate reason for its adverse action).

Accordingly, Hutchinson's motion for summary judgment will be denied on these grounds.

**B. Interference**

An interference claim arises when an employer interferes *ex ante* with an employee's exercise of his FMLA rights. To prevail on an FMLA interference claim, a plaintiff must establish: "1) that []he is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that []he was entitled to take leave under the FMLA; 4) that []he gave notice to the defendant of h[is] intention to take leave; and 5) that []he was denied benefits to which []he was entitled under the FMLA." *Graziadio*, 817 F.3d at 424.

Hutchinson argues that Mr. Nzugang's interference claim also cannot survive summary judgment because he cannot show that he was entitled to FMLA leave, that he was denied any benefit under the FMLA, or an inference that his exercise of rights under the FMLA "was a negative factor in the company's decision to terminate him." Mot. at 2.

The Court will address only the denial element because it is dispositive.

Hutchinson argues that Mr. Nzugang cannot establish that he was denied FMLA leave that he was entitled to take. Mot. at 20. More specifically, Hutchinson contends that "FMLA leave must be approved, and approval of [the] same comes with circumstantial prerequisites," such as the certification required under 29 U.S.C. § 825.306. *Id.* Hutchinson argues that Mr. Nzugang never formally applied for FMLA leave and did not submit the required certification and therefore, he "cannot then prove that any benefits to which he was entitled were denied." *Id.*

In response, Mr. Nzugang argues that he was denied FMLA leave because he "provided notice of his need for family leave" and Hutchinson "admits to approving his FMLA request." Opp'n at 21. In Mr. Nzugang's view, he was simply waiting for his wife's surgery date to be confirmed. *Id.* Mr. Nzugang argues that "[b]y terminating [him], [Hutchinson] interfered with [his] right to take the future family leave to care for his wife." *Id.*

The Court disagrees.

Mr. Nzugang does not argue that Hutchinson improperly denied his FMLA leave request or discouraged him from taking FMLA leave. Instead, his interference claim is premised on the theory that, by terminating him, Hutchinson prevented Mr. Nzugang from exercising rights to which he would have been entitled under the FMLA had he remained employed by the company. *See* Opp'n at 20–21. Moreover, Mr. Nzugang does not dispute that he never formally applied for FMLA leave or completed the required certification. *See id.* at 21 (stating that Mr. Nzugang only "provided notice of his need for family leave").

Therefore, because Mr. Nzugang never submitted a request for FMLA leave through Hutchinson's established procedures, which require submitting a certification, and he has not identified any "unusual circumstances,"[8] he cannot show that Hutchinson denied him FMLA leave. *See Kelly v. Hartford Fin. Servs. Grp., Inc.*, 818 F. App'x 83, 85 (2d Cir. 2020) (affirming dismissal of FMLA interference claim where the plaintiff "informally and verbally notified his managers of his wife's second pregnancy and his intent to take FMLA leave approximately eight months later . . . [but] in the nearly six months between this alleged notice and his alleged

[8] Mr. Nzugang's wife's inability to schedule her surgery due to the COVID-19 pandemic is not an "unusual circumstance" because this issue is not related to Mr. Nzugang's ability to use Hutchinson's FMLA procedures but is instead related to whether Mr. Nzugang needs (and is entitled to) FMLA leave at all. *See* 29 C.F.R. § 825.302(d) (explaining that unusual circumstances include "situations such as when an employee is unable to comply with the employer's policy that requests for leave should be made by contacting a specific number because on the day the employee needs to provide notice of his or her need for FMLA leave there is no one to answer the call-in number and the voice mail box is full").

constructive termination, [the plaintiff] never once applied for leave through the established procedures," and the plaintiff could not "point to any 'unusual circumstances' that precluded him from applying through those procedures" (citing 29 C.F.R. § 825.302(d))); *see also Amley*, 2021 WL 4429784, at *11 ("[I]t is undisputed that the Plaintiff did not comply with [the company's] FMLA notification procedures at any time. That alone defeats any FMLA interference claim predicated on an employer's failure to give notice." (citation omitted)).

Accordingly, Hutchinson's motion for summary judgment will be granted as to the interference claim.

## IV. CONCLUSION

For the foregoing reasons, Hutchinson's motion for summary judgment is **GRANTED in part** and **DENIED in part.**

Hutchinson's motion for summary judgment is granted as to the interference claim and denied as to the retaliation claim.

**SO ORDERED** at Bridgeport, Connecticut, this 14th day of July, 2023.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE